# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS

In re

**CHARLES RIVER PRESS
LITHOGRAPHY, INC.,**

      **Debtor**

**Chapter 7
Case No. 03-20352-RS**

---

**DONALD R. LASSMAN,
CHAPTER 7 TRUSTEE,**

      **Plaintiff**

v.

**LESLIE A. MCQUILLAN,**

      **Defendant**

**Adversary Proceeding
No. 04-1190-RS**

## MEMORANDUM OF DECISION

Donald R. Lassman is the Chapter 7 trustee of Charles River Press Lithography, Inc. ("Trustee") ("Debtor"). As Trustee, Lassman filed a complaint against Leslie A. McQuillan ("McQuillan"), a former employee of the Debtor. In that complaint, Lassman seeks (a) declaratory judgment that a certain fund of money, comprising the net cash surrender proceeds of a certain life insurance policy, is property of the bankruptcy estate and not property of McQuillan or, in the alternative, (b) recovery of such proceeds through avoidance of the transfer of that insurance policy to McQuillan as (i) an unauthorized post-petition transfer or (ii) a constructively fraudulent transfer or (iii) a preferential transfer.

On June 1, 2005, the Court conducted a trial of the complaint at which two witnesses

testified (McQuillan and an employee of the insurer, Sun Life Assurance Company of Canada)

and fourteen documents were admitted into evidence. For the reasons set forth below, the Court

finds that the proceeds of the insurance policy are property of McQuillan and that the transfer of

such funds to her is not avoidable by any means invoked by the Trustee. Accordingly, the Court

will enter judgment in favor of McQuillan.


**Facts and Procedural History**

The material facts underlying this matter are not disputed, as reflected in the parties' joint

pre-trial memorandum and in the testimony and documents introduced at trial. Such factual

disputes as may exist are either not material or not relevant to the outcome. The Court outlines

the salient facts below.


*a.*     ***Bankruptcy Case***

On December 18, 2003, three creditors commenced this case by filing an involuntary

petition against the Debtor. On January 13, 2004, the Debtor not having contested the

involuntary petition, the Court entered an order for relief under Chapter 7. On January 16, 2004,

the Trustee was appointed. Since then, the case has proceeded in the ordinary course of

bankruptcy administration as a liquidation under Chapter 7.


*b.*     ***McQuillan's Employment***

Prior to its bankruptcy case, the Debtor operated a printing business. In early 1993, the

Debtor and McQuillan engaged in discussions regarding her employment by the Debtor. By

letter dated April 28, 1993 ("April Letter"), the Debtor offered to hire McQuillan as a sales

representative on specified terms.  Under the terms of the offer, the Debtor would, subject to

certain conditions and as part of McQuillan's package of compensation, provide to McQuillan a

life insurance policy.  McQuillan accepted the Debtor's offer and commenced her employment

on July 1, 1993.  By letter dated July 23, 1993 ("July Letter"), seemingly in furtherance of the

insurance policy component of her compensation, the Debtor advised McQuillan of the issuance

of the promised insurance policy by the Sun Life Assurance Company of Canada ("Sun Life")

("Policy") and the conditions under which it was being provided to her.[1]  McQuillan signed the

July Letter.

On or about January 10, 1994, the Debtor, through its then controller, presented an

agreement to McQuillan for her signature ("January Agreement").  The January Agreement

modified the conditions to which the Policy was subject in a manner unfavorable to McQuillan.

Without first reading the document or even understanding that it modified the terms of her earlier

agreement concerning the Policy, McQuillan signed the January Agreement.

On October 28, 2003, McQuillan's employment by the Debtor ended.[2]

c.    ***The April Letter***

The Debtor's employment offer to McQuillan is set forth in the April Letter.  Among

--------------------------------------------------

[1]The Debtor applied for the policy on October 4, 1993 and Sun Life issued it on
November 18, 1993.  The timing of the policy application and issue is not material to the
outcome of this matter.

[2]There is no indication in the record whether McQuillan left voluntarily or was dismissed
with our without cause.  For the purposes of this decision, and in view of the transfer of the
Policy to McQuillan discussed below, the Court assumes that McQuillan either left voluntarily or
was terminated without cause.

other matters, the April Letter specifies the terms under which the Policy is being provided to McQuillan. The key terms are these: the Debtor would obtain a policy on McQuillan's life with a minimum death benefit of $200,000 (increasing annually). McQuillan would select the beneficiary. The Debtor would pay the policy premiums and retain ownership of the policy until McQuillan's employment reached its ten-year anniversary, whereupon ownership of the Policy, including its cash value, would be transferred to McQuillan. If she died while in the Debtor's employ before her ten-year anniversary, her beneficiary would receive the policy death benefit (i.e., $200,000 or more). As noted, McQuillan's employment commenced July 1, 1993. Therefore, under these terms, she would become the owner of the policy if she remained in the Debtor's employ through June 30, 2003.

### d.   *The July Letter*

The July Letter, which the Debtor and McQuillan each signed, elaborated upon the April Letter in two respects. First, it stated the rationale and motivation for the Debtor's provision of the Policy. The July Letter characterized the Policy as "an incentive for the faithful performance" by McQuillan of her duties and as "additional compensation" provided to "strengthen the bonds of loyalty" between McQuillan and the Debtor and to "enable [her] to feel more secure both as to [her] family and [her] own future."

And second, the July Letter confirmed and supplemented the terms under which McQuillan would benefit from and by virtue of the Policy as follows. During her employment but *before* her forty-eighth birthday,[3] the Debtor would own the Policy and pay the Policy

---

[3] The April Letter employed a ten-year anniversary benchmark (i.e., June 30, 2003). The July Letter employed a forty-eighth birthday benchmark (i.e., July 2, 2003). The difference is immaterial because McQuillan remained in the Debtor's employ through October 28, 2003.

premiums, but McQuillan would name the beneficiary to whom the Policy death benefit would

be paid if McQuillan died or were terminated without cause during this period. In addition, the

Debtor agreed that during this same period, the Debtor would neither cancel nor borrow against

the Policy without McQuillan's consent. Upon McQuillan's forty-eighth birthday, the Debtor

would transfer ownership of the Policy to her (including cash value accretions) and surrender to

her any and all rights it may then have in the Policy. However, if, before her forty-eighth

birthday, McQuillan were to leave the Debtor's employ voluntarily or be terminated for cause,

she would forfeit all rights in and to the Policy.


    *e.*    ***The January Agreement***

    The January Agreement, which McQuillan signed without reading, would, if given effect,

significantly alter her rights with respect to the Policy.[4] It reduces the value of the benefits

promised and provided under the April and July Letters by effecting three key changes to the

parties' rights. First, the January Agreement permits the Debtor to borrow against the Policy on

its own account without McQuillan's consent. Second, the January Agreement reduces the death

benefit payable to McQuillan's beneficiary (or her estate) under the Policy during her

employment by an amount equal to the cumulative premiums paid on the Policy by the Debtor

(less any borrowings by the Debtor).

    Third, and for present purposes most important, the January Agreement modifies the

parties' rights with respect to ownership and transfer of the Policy. It provides that "the

Company [the Debtor] shall be the owner of the insurance policy . . . except as otherwise

---

[4] The January Agreement makes clear that it supersedes any prior agreement between the
parties as to the insurance policy. January Agreement, ¶ 12(d).

hereinafter provided."[5] The Agreement goes on to provide that upon the occurrence of certain events that would cause the January Agreement to terminate—including either termination of McQuillan's employment (without regard to cause or voluntariness) or simple written notice by either McQuillan or the Debtor to the other—McQuillan may acquire ownership of the Policy, but only on the condition that she first pay to the Debtor the Policy's cash surrender value.[6] There is no separate provision for automatic transfer of the Policy to McQuillan upon her forty-eighth birthday, though she would be free to give notice of termination upon her forty-eighth birthday and thus trigger such rights to transfer as the January Agreement provides. But, under the January Agreement, she has no right to obtain ownership of the Policy that is not conditioned on her first paying to the Debtor the Policy's cash surrender value. In effect, the January Agreement withdraws an automatic right to transfer of ownership and substitutes for it a right to purchase the policy for its cash surrender value.

McQuillan contends that the January Agreement should not be given effect because of the circumstances in which she signed it and in which the Debtor obtained her signature. She contends that she did not understand the import of what she'd been given to sign and had been misled by the Debtor (though perhaps not intentionally) as to the contents of this document. I make the following findings with respect to those events and circumstances. McQuillan's unrebutted testimony, while somewhat vague on certain points, is credible and plain on the key ones. The Debtor's controller, John Fox, presented the January Agreement to her for signature. Coming from John Fox, she considered the request for her signature to be "administrative," not substantive: "I wouldn't have thought it changed . . . anything." Her previous negotiations of

---

[5]January Agreement, ¶ 1.

[6]January Agreement, ¶¶ 7-8.

terms of employment had been with the Debtor's president, Frank Nappa; Nappa had not

discussed any change in terms with her. Fox did not tell her she could not read the document, but

neither did he explain it to her or tell her what she was being asked to sign. She signed without

reading it because she had no reason to believe it altered her rights as to the Policy under her

existing employment deal. She had no indication from the controller or anyone else that her

compensation terms were being revisited, much less changed. She did not testify explicitly that,

had she understood that her rights were being altered by the January Agreement, she would not

have signed it. However, she did testify regarding the Policy that they "gave me the agreement, I

trusted them, and there wasn't a whole lot to talk about until later years."

McQuillan received no consideration for the January Agreement. Any rights, benefits, or

promises she "acquired" under that agreement were such as she already enjoyed under her pre-

existing employment agreement, as set forth in the April and July Letters. The January

Agreement significantly curtailed those preexisting rights; she acquired no new benefit either

under the January Agreement or in exchange for entering into it.


### f.    *The Insurance Policy*

Whatever the changes wrought by the January Agreement, McQuillan did indeed remain

in the Debtor's employ through and beyond both her ten-year employment anniversary and her

forty-eighth birthday. The actions of the parties with respect to the Policy immediately before

and after that date (as well as immediately before and after the petition date) are somewhat

convoluted but yield this summary: mindful of her entitlement to the Policy, and as her forty-

eighth birthday approached, McQuillan approached the Debtor regarding the ownership transfer,

and the Debtor, presumably mindful of its obligations to McQuillan and after some fits and starts

in the transfer paperwork, succeeded in transferring ownership of the Policy to McQuillan.[7]  In

exchange for this transfer of the Policy, she did not pay to the Debtor the cash surrender value of

the policy or any amount.  All she gave in exchange for the Policy was her ten years of

continuous service to the Debtor.

Subsequent to that transfer, the Trustee commenced this lawsuit, naming both Sun Life

and McQuillan as defendants.  Pursuant to an order of this Court, Sun Life paid the net cash

surrender value, $18,039.65 (the "Proceeds"), into an interest-bearing escrow account held

jointly by counsel to the Trustee and to McQuillan.  The claims against Sun Life were thereupon

dismissed.  Thus, there remains only the question of who, as between the estate and McQuillan,

is entitled to the Proceeds.

### Positions of the Parties

The issues presented, and the parties' positions on those issues, may be summarized as

follows.  They fall into two broad categories: those pertaining to ownership of title to, and of the

equitable interest in, the Policy as of the date on which this involuntary case was commenced;

and those concerning exercise of the Trustee's avoidance and strong-arm powers.

#### a. Declaratory Judgment as to Ownership

First, in Count I of his Amended Complaint, the Trustee seeks a declaration confirming

that the Policy remained an asset of the Debtor as of the commencement of the case and therefore

---

[7] There is some disagreement regarding the effective date of transfer.  Sun Life treats the
transfer date as February 24, 2004, the date the required Sun Life transfer request form was
signed by the Debtor.  The Debtor's initial transfer request is dated October 22, 2003 but was
sent on the "wrong" form.  In view of my decision, the transfer date is not material.

became an asset of the estate under 11 U.S.C. § 541(a)(1). This count for declaratory judgment raises two discrete sets of issues, one relating to legal title to the policy and the other to the equitable interest therein. With respect to legal title, the Trustee contends that title did not pass to McQuillan prior to commencement of the case because the proper forms for transfer of ownership on the books of the insurance company had not been completely processed by the Insurer when the involuntary petition was filed. McQuillan responds that title should be deemed to have passed prepetition, on October 27, 2003, when the Debtor requested that Sun Life absolutely assign ownership of the policy to her.

With respect to the equitable interest in the policy, McQuillan argues that, even if legal title to the Policy remained in the Debtor as of the commencement of the case, the equitable interest in that policy should be deemed to have belonged to McQuillan as of the date (July 1 or 2, 2003) on which, under her agreement with the Debtor, the Debtor became obligated to transfer it to her. She contends that she held an equitable interest in the nature of either an express trust or, in the alternative, either a resulting trust or a constructive trust. By operation of 11 U.S.C. § 541(d), her equitable interest would not enter the estate via § 541(a)(1) or (2).

In conjunction with her assertion of an equitable interest in the Policy, McQuillan contends that the operative agreement with the Debtor is set forth in the April and July Letters. She maintains that the January Agreement is not enforceable for two reasons: the Debtor gave no consideration for it; and, even if consideration was given, the January Agreement should be rescinded and deemed a nullity because, although she signed that Agreement, she had not read it and was mistaken about its contents because the Debtor had misled her into believing the document was merely administrative and not substantive. The Trustee maintains that the January Agreement is binding, the Debtor having signed it at her peril, and that, under the January

Agreement, the Debtor never became obligated to transfer the policy.

### b. Trustee's Avoidance and Strong-Arm Powers

If the Court should determine that McQuillan acquired an interest in the Policy, then the Court must go on to address the Trustee's assertion of his avoidance and strong-arm powers. First, the Trustee contends in Count II of the Amended Complaint that if McQuillan received an interest in the Policy only postpetition (as she would have if the transfer was accomplished by postpetition completion of the transfer on the books of the insurer), then the transfer thereby effected can be avoided under 11 U.S.C. § 549(a) as an unauthorized postpetition transfer of an asset of the estate. Second, the Trustee contends in Count III of the Amended Complaint that, if the Policy or the equitable interest in it was transferred to McQuillan in the year immediately preceding the filing of the involuntary petition, that transfer is avoidable under 11 U.S.C. § 548(a)(1) as a fraudulent conveyance; the Trustee maintains that, insofar as McQuillan did not, in exchange for the policy, pay the Debtor its cash surrender value (as was required by the January Agreement), the Debtor received less than a reasonably equivalent value for the transfer. Third, and in the alternative, the Trustee contends in Count IV of the Amended Complaint that, if the Policy is deemed to have been transferred to McQuillan during the 90 days immediately preceding the filing of the involuntary petition against the Debtor, then that transfer is avoidable under 11 U.S.C. § 547(b) as a preferential transfer. Last, the Trustee argues that if McQuillan acquired an equitable interest in the Policy prepetition, that interest, being unrecorded, would still be inferior to the Trustee's rights as a hypothetical lien creditor under 11 U.S.C. § 544.

## Discussion

Though the issues outlined above are numerous, the Court considers two to be determinative of the outcome: whether the January Agreement is a valid and enforceable contract and modification of McQuillan's rights under the April and July Letters; and, if not, whether McQuillan's right under the April and July Letters to transfer of the Policy on July 1, 2003, should be deemed to have created in her an equitable interest (if not full legal title) in the Policy as of that date. For the reasons set forth below, the Court holds that the January Agreement is unenforceable and that, in view of McQuillan's right under the April and July Letters to receive the policy on July 1, 2003, the Debtor should be deemed, under a constructive or resulting trust theory, to have held the property in trust for McQuillan from that date forward. The transfer of an equitable interest as of July 1, 2003, is not a preferential transfer because it occurred more than 90 days prepetition; nor is it a fraudulent transfer, because, under the April and July Letters, the consideration for the transfer was McQuillan's ten years of service to the Debtor, more than reasonably equivalent value. The postpetition transfer count is rendered moot: the avoidance of the postpetition transfer of legal title on the books of the insurer would still leave McQuillan with the equitable interest that arose prepetition. And without addressing its merits, I hold that the Trustee's invocation of his rights and powers under § 544 fails for lack of timely assertion.

### a.   *Property of the Estate*

The commencement of a bankruptcy case by the filing of a petition, voluntary or (as here) involuntary, creates an estate. 11 U.S.C. § 541(a). The estate so created includes, subject to certain exceptions, "all legal or equitable interests of the debtor in property as of the

11

commencement of the case." 11 U.S.C. § 541(a)(1). By an express exception, however, this

language does not bring into the estate the equitable interest in property in which the debtor holds

only legal title. "Property in which the debtor holds, as of the commencement of the case, only

legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1)

or (2) of this section only to the extent of the debtor's legal title to such property, but not to the

extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. §

541(d). The Trustee's position is that, on the date of the involuntary petition, the Debtor retained

both legal title and all equitable interest in the Policy; McQuillan maintains that the Debtor had

parted with both. To determine what interest a debtor holds in property at the commencement of

a case, courts must look to state law.[8] In this instance, the applicable law is that of the

Commonwealth of Massachusetts. The parties agree that the Debtor acquired the Policy in its

own name; therefore, the burden is on McQuillan to show that the Policy, or at least the equitable

interest therein, passed to her prior to the commencement of the case.

    The Trustee argues that, because an insurance policy is a contract, title to a policy is

governed by the contract itself, and that the conditions of transfer of ownership in this Policy

were not satisfied as of the filing of the petition; therefore, he concludes, title remained in the

Debtor. Without addressing the merits of this argument, I note that, at best, it resolves only the

contractual issue of whom the *insurer* is entitled to recognize and treat as the owner of the policy.

The Policy was not a contract between the Debtor and McQuillan, but between the Debtor and

the insurer, and therefore does not resolve issues of ownership as between the Debtor and

McQuillan. Even if the Debtor retained the status of owner under the Policy through the filing of

the bankruptcy petition, and remained at all relevant times the party whom the insurer was

---

[8] *Butner v. United States et al.*, 99 S.Ct. 914, 440 U.S. 48, 59 L.Ed.2d 136 (1979).

obligated to treat as the owner, the question would remain: had the Debtor transferred, or should it be deemed to have transferred, to McQuillan such contractual rights as it held under the Policy? This is precisely the issue that is the subject of McQuillan's arguments for the existence of an equitable interest in the Policy, and therefore I turn directly to those arguments.

McQuillan contends that, as of the prepetition date on which she became contractually entitled to the Policy, she acquired, or should be deemed to have acquired, an equitable interest in the Policy by an express trust, or, if not an by express trust, then by virtue of a resulting trust or a constructive trust. Whether by express trust or resulting or constructive, McQuillan's argument is predicated on the existence of a contractual right to transfer of the Policy on the tenth anniversary of her employment without need to pay the cash surrender value. The Trustee does not dispute that McQuillan had such a right *before* the parties entered into the January Agreement, but he contends that the January Agreement is binding and annulled any such preexisting right. McQuillan denies that January Agreement is binding and enforceable. Because McQuillan's arguments for an equitable interest are contingent on the nonenforceability of the January Agreement, I consider first the issues of contract.

### b.    *The Employment Contract*

Is the January Agreement a valid and enforceable contract and modification of the preexisting contractual rights memorialized in the April and July Letters? Though McQuillan signed that agreement, she maintains that it is *not* binding, both for lack of consideration and because she was misled as to its contents.

13

1.   **Lack of Consideration**

McQuillan contends that the January Agreement is not an enforceable contract, and therefore does not displace her preexisting contractual rights, because she received no consideration for signing it. The Plaintiff does not address this issue.

The evidence is simple and clear. Ms. McQuillan testified that she received no compensation for signing this agreement,[9] and her testimony is credible and uncontroverted. Any rights, benefits, or promises she "acquired" under that agreement included none she had not already obtained under her pre-existing employment agreement, as set forth in the April and July Letters. The January Agreement significantly curtailed those preexisting rights; she acquired no new benefit either under the January Agreement or in exchange for entering into it. I therefore conclude that the January Agreement does not satisfy this basic requirement of contract formation and accordingly is not enforceable against McQuillan.

2.   **Rescission for Mistake**

In the alternative, the Debtor argues that the January Agreement is unenforceable because, when she signed it, she had not read it and was mistaken about its contents, the Debtor having misled her into believing the document was merely administrative and not substantive.[10] In response, the Trustee advances a single theme: McQuillan signed the January Agreement voluntarily and, if she did so unknowingly, then that is because she chose not to review it or to pose to the Debtor any questions about it. Having freely signed the agreement, she is bound by

---

[9]   Trial transcript, p. 41.

[10]   In view of my ruling that the January Agreement is invalid for lack of consideration, I need not address this issue but do so in the interest of providing a fuller record of decision.

14

it.

Massachusetts law on the issue presented consists of the following diverse holdings. "The general rule is that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not or whether he can read or not."[11] Moreover, as a general rule, a mistake is cause to rescind a contract only if it is shared by both parties.[12] These, however, are general rules, subject to exceptions. A unilateral mistake of fact may be cause to rescind if (i) the other party had reason to know of the mistake or (ii) the mistake was the fault of the other party.[13] In addition, "[o]ne party cannot enforce a contract against another whose signature he has procured by fraud or fraudulent representations, which induced the signer reasonably to believe and understand that the instrument was substantially different from what it really was."[14] Other authorities go further and hold that rescission may be justified even where the causative misrepresentation is innocent and not fraudulent or culpable.[15]

---

[11] *De Luca v. Bear Stearns & Co.*, 175 F.Supp. 2d 102, at 115 (D.Mass. 2001), citing *Tiffany v. Sturbridge Camping Club, Inc.*, 32 Mass.App.Ct. 173, 175 n. 5 (1992), citing *Spritz v. Lishner*, 355 Mass. 162, 164, 243 N.E.2d 163 (1969). See also *Canney v. New England Tel & Tel Co.*, 353 Mass. 158, 165 (1967), citing *Cohen v. Santoianni*, 330 Mass. 187, 193, 112 N.E.2d 267, 271 and cases cited, for same principle.

[12] *Community Builders, Inc. v. Indian Motorcycle Associates*, 44 Mass.App.Ct. 537 (1998).

[13] *Covich v. Chambers*, 8 Mass.App.Ct. 740 (1979), and *Corporate Design Ins. Agency v. Thomas Ford Sales*, 2001 Mass. App. Div. 34 (2001).

[14] *Boston Five Cents Sav. Bank v. Brooks*, 309 Mass. 52, 55, 34 N.E.2d 435 (1941); and *Bogosian v. New York Life Ins. Co.*, 315 Mass. 375 (1944) (a fraudulent misrepresentation of the nature and contents of a writing by which one was induced to sign it may render the instrument voidable).

[15] See *Yorke v. Taylor*, 332 Mass. 368, at 371 (1955) (vendor's misrepresentation was cause to rescind sale; "In this Commonwealth one who has been induced to enter into a contract in reliance upon a false though innocent representation of a material fact susceptible of knowledge which was made as of the party's own knowledge and was stated as a fact and not as

Insofar as the Debtor is, in effect, seeking rescission of an agreement that she signed, she bears the burden of showing cause to rescind. I find that she has established cause to rescind in that she signed the agreement on the basis of a false understanding as to the nature of the document she was being asked to sign, which false understanding was created in her by the Debtor's own actions. This false understanding was created in two ways, both by what the Debtor did and by what it failed to do. First, by presenting the matter to her through controller John Fox, especially without explanation as to the import of the document, the Debtor implied that the document was strictly administrative in nature, not affecting any substantive rights. Second, the Debtor's president, Frank Nappa, failed to discuss the proposed changes with her. McQuillan had always dealt with him in negotiations of the terms of her employment; this was a material term; and she had every reason to believe that a modification on the order wrought by this agreement would first be the subject discussion and negotiation between them.

The evidence tends to warrant a finding that the Debtor acted in less than a fully disclosing and straightforward manner in eliciting McQuillan's consent without explanation. Tellingly, the Debtor, presumably aware of the extent of the changes wrought, nonetheless accepted her signature even though she had not read the document. Still, it is not clear to me that

---

matter of opinion is entitled to rescission."); *Pepsi-Cola Metropolitan Bottling Co. v. Pleasure Island, Inc.*, 345 F.2d 617, 622 (1st Cir. 1965) ("It is the rule in Massachusetts that 'one who has been induced to enter into a contract in reliance upon a false though innocent misrepresentation of a material fact susceptible of knowledge which was made as of the party's own knowledge and was stated as a fact and not as a matter of opinion is entitled to rescission."); *Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.2d 216, 224 (1st Cir. 2003) (applying Massachusetts or Michigan law, saying there is no material difference between the two, and stating: "Rescission is an equitable remedy, and can be imposed on a contract even in the absence of culpable behavior."); and RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.").

16

the Debtor acted with fraudulent intent, especially where, upon McQuillan's tenth anniversary,

both Nappa and Fox acted to transfer the Policy to her as if the January Agreement had never

happened. On the limited evidence before me, the Debtor's behavior in the matter is inconsistent

and less than fully intelligible.[16] Whatever the degree of the Debtor's culpability in the matter, I

am satisfied that the Debtor effectively misled her in the matter, and I conclude that the Debtor

has thus established cause for rescission. For this reason, and for lack of consideration, the

January Agreement shall be treated as a nullity; and McQuillan's rights in the matter shall be

governed by the agreement memorialized in the April and July Letters.


c.    ***Equitable Interest***

McQuillan argues that, since at least July 1, 2003, she should be deemed to have held an

equitable interest in the Policy under an oral express trust or, in the alternative, under a resulting

trust or a constructive trust. The Trustee denies that the Debtor and McQuillan either created or

intended to create an express trust; and also he denies that cause exists to deem the Policy to have

been subject to either a resulting or a constructive trust. The resolve these issues, the Court looks

to Massachusetts law.

Under Massachusetts law, an *express trust* in personal property may be created by an oral

---

[16] I have no evidence of the genesis of the January Agreement: who caused it to be
drafted, dictated its terms, reviewed it, and ordered that it be presented to McQuillan for her
signature. It is drafted on the Debtor's letterhead and bears the signatures of both the president,
Frank Nappa, and the controller, John Fox, so they likely had knowledge of its contents. But this
is not corroborated by any other evidence, and it is inconsistent with Nappa's and Fox's later
conduct regarding the policy. (And a signature is no guarantee that the signer has read the
document.) Perhaps it was drafted for them by outside counsel and they forwarded it to
McQuillan innocently without knowledge that it varied from the terms of her employment. This
is speculation, of course, but serves to demonstrate that even mutual mistake of fact is not
implausible here.

17

statement. *Cooney v. Montana*, 347 Mass. 29, 34 (1966). Whether such a trust is created

depends primarily upon the manifestation of an intent to create a trust, which is ordinarily a

question of fact. The creation of an express trust does not depend upon the use of specific

terminology. Rather, whatever the terminology, a party seeking to establish the existence of a

trust must show unequivocally an intention that the legal estate be vested in one person to be held

in some manner or for some purpose on behalf of another. *Id.*; *Ventura v. Ventura*, 407 Mass.

724 (1990); *Russell v. Russell*, 18 Mass.App.Ct. 957, 959 (1984).

Unlike an express trust, which is created by a settlor, resulting and constructive trusts are

created or imposed by courts as remedial devices. A *resulting trust* is an equitable device,

employed to correct a defect in the execution of a transferor's intent. "A resulting trust arises

where a person makes or causes to be made a disposition of property under circumstances which

raise an inference that he does not intend that the person taking or holding the property should

have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is

otherwise effectively disposed of." RESTATEMENT (SECOND) OF TRUSTS § 404 (1959); *Valente*

*v. Fleet National Bank*, 360 F.3d 256 (1ˢᵗ Cir. 2004), at 263 n.4 (resulting trusts are used

primarily to enforce the parties' unstated plan at the time of the transfer).

On the other hand, a *constructive trust* "is imposed not because of the legally inferred

intention of the parties but because the court concludes that the person holding the title to the

property, if permitted to keep it, would profit by a wrong or would be unjustly enriched, having

acquired the property through fraud, mistake, breach of duty, and the like." RESTATEMENT

(THIRD) OF TRUSTS, § 7 cmt. d; *Fortin v Roman Catholic Bishop of Worcester*, 416 Mass. 781,

788 (1994) ("Under Massachusetts law, a court will declare a party a constructive trustee of

property for the benefit of another if he acquired the property through fraud, mistake, breach of

duty, or in other circumstances indicating that he would be unjustly enriched."). While a resulting trust, like an oral express trust, is intended to give effect to the parties' intent, a constructive trust is typically employed in the absence of any intention of the parties to create a trust, whenever title to property is found in one who in fairness ought not to be allowed to retain it. *Barry v. Covich*, 332 Mass. 338, 342 (1955).

I make the following findings with respect to the intent of the Debtor and McQuillan with respect to the Policy. They clearly did intend and agree that upon the tenth anniversary of her employment, the Debtor would transfer ownership to McQuillan, and the cash value of the policy would belong to her. This obligation to transfer would be absolute, and the right of transfer would be immediate. Moreover, as between them, the transfer would require no further action: "upon completion of ten years of employment . . . all Cash Values *are your property.*" April Letter, § 8 (emphasis added). In their agreement and negotiations, they took no account of the fact that transfer to McQuillan of the Debtor's rights under the policy would involve a third party, the insurer, and that this in turn would cause administrative delay in effecting the transfer to the satisfaction of the insurer. Consequently, they never contemplated that legal title to the policy would be separated from the beneficial interest in it. They simply expected that both would be transferred together, effective as of her tenth anniversary. However, it is also fair to infer that they intended for the equitable interest to pass on that anniversary, regardless of whether legal title also passed at that time. Any administrative delay in transferring control of the policy would be, in their manifest intent, nothing more than that: just a lag time in which legal control was temporarily separated from the beneficial interest. During this period, the Debtor retained no right to do anything with the Policy for its own benefit. Rather, the Debtor retained only limited rights as to the Policy: to effect transfer of legal control as expeditiously as

possible, to preserve the rights of ownership intact for McQuillan, and, insofar as decisions

needed to be made about the Policy, to ascertain and implement McQuillan's wishes, not its own.

In essence, then, the Debtor retained only the powers of a trustee. No other reading is consistent

with their agreement that the transfer be effective on her tenth anniversary of employment.

I conclude that the Debtor and McQuillan intended that, upon McQuillan's tenth

anniversary of employment, the equitable interest in the Policy would pass immediately to

McQuillan and the legal estate pass with it, but if not with it, then as soon as possible thereafter,

and that during the interim, when legal estate lagged behind beneficial interest, the legal estate

would be held by the Debtor only for the benefit of McQuillan. McQuillan and the Debtor

cannot be said to have created an express trust: they simply never contemplated that legal title

might lag behind—be separated from—the beneficial interest. However, it is fair to say that the

delay in transferring legal title was a defect in the execution of the Debtor's and McQuillan's

intent, and that it was clearly their intent that the beneficial interest pass immediately. The

purpose of a resulting trust is to correct a defect in the execution of a transferor's intent. To

reiterate, "[a] resulting trust arises where a person makes or causes to be made a disposition of

property under circumstances which raise an inference that he does not intend that the person

taking or holding the property should have the beneficial interest therein, unless the inference is

rebutted or the beneficial interest is otherwise effectively disposed of."[17] Here, the delay

occurred in circumstances which clearly raise an inference that the Debtor and McQuillan did not

intend that the entity retaining legal control should also retain the beneficial interest therein.

Accordingly, the Court holds that, as of McQuillan's tenth anniversary of employment, the

---

[17] RESTATEMENT (SECOND) OF TRUSTS § 404 (1959); *Valente v. Fleet National Bank*, 360 F.3d 256 (1st Cir. 2004), at 263 n.4 (resulting trusts are used primarily to enforce the parties' unstated plan at the time of the transfer).

Debtor held legal title to the property subject to a resulting trust for the benefit of McQuillan.

The Trustee makes much of the mechanics of the administration and transfer of the Policy by Sun Life, noting that the Debtor never informed Sun Life of McQuillan's rights until Policy transfer came to the fore. These arguments are misplaced. The matter at issue is not what Sun Life did or intended with respect to the Policy but rather what the Debtor and McQuillan did and intended as between them. The April and July Letters unambiguously show their intention that, upon the tenth anniversary of her employment, any and all rights of the Debtor in the Policy would pass to McQuillan.

The bankruptcy court's decision in *In re Snider Bros., Inc.*, 12 B.R. 87 (Bankr. D. Mass. 1981) usefully illuminates this matter. Although the facts differ in some respects, the overriding principle of equitable treatment for an employee's ongoing reliance upon an employer's past promise of a future benefit from an asset continuously maintained applies here with compelling logic. In that case, the court found and imposed a resulting trust where the employee agreed to reduced compensation and a non-compete covenant in exchange for two insurance policies to be held in trust for the employee's benefit. The trust arrangement and its attendant formalities were never completed yet, after thirty years of faithful performance, the employee was held to be entitled to the policies, and the court employed a resulting trust as the equitable device to deliver that benefit.

In this case, while there is no explicit trust language, there is the clear intent, as reflected in the Letters and implemented by the Debtor's actions, that the Debtor would hold and maintain the Policy for the future benefit of McQuillan. On her part, McQuillan provided valuable consideration for the transfer of the Policy, not at the end of her employment but from its very inception and throughout its duration. In view of the Letters, their specificity and lack of

21

ambiguity, the early issuance of the Policy, the absolute right of McQuillan to any and all rights of the Debtor under the policy upon the tenth anniversary of her employment, and the consideration of McQuillan's uninterrupted service, it is appropriate here to employ a resulting trust to give effect to the parties' intent.[18] These factors support McQuillan's contention that, at least as of the tenth anniversary of her employment, the Policy was intended, and must now be treated, to have been held and administered by the Debtor on her behalf. I conclude that the equitable interest in the Policy was not among the Debtor's assets at the commencement of this bankruptcy case and therefore did not had enter the bankruptcy estate under § 541(a)(1).

### d.   _The Avoidance Counts_

The Trustee contends that, even if the equitable interest was transferred prepetition, he may avoid that transfer and recover the interest under four specific avoidance powers.[19] I find no merit in them.

First, the Trustee's Count II, for avoidance of the transfer under 11 U.S.C. § 549(a) as an unauthorized postpetition transfer of an asset of the estate, is moot because the transfer of the beneficial interest occurred prepetition. It is possible that the transfer of legal title occurred postpetition; if so, that transfer was indeed unauthorized and therefore would be avoidable under § 549(a), but the avoidance of that transfer would restore to the estate only legal title, not the

---

[18] A compelling case can be made for a constructive trust where, as here, the estate would be paid McQuillan's compensation should the Trustee prevail, a manifest unjust enrichment. Given my determination of resulting trust, I need not and do not impose this alternative remedy.

[19] An interest recovered by the Trustee would enter the estate under § 541(a)(3) (estate includes certain interests in property that the trustee recovers). The exclusion of equitable interests by § 541(d) applies only to prevent those equitable interests from entering the estate via § 541(a)(1) and (2). Section 541(d) would not prevent their entering the estate via § 541(a)(3).

22

beneficial interest. The right to the proceeds follows the beneficial interest.

Second, the Trustee contends in Count III of the Amended Complaint that, if the Policy or the equitable interest in it was transferred to McQuillan in the year immediately preceding the filing of the involuntary petition, that transfer is avoidable under 11 U.S.C. § 548(a)(1) as a fraudulent conveyance. The Trustee maintains that, insofar as McQuillan did not, in exchange for the policy, pay the Debtor its cash surrender value (as was required by the January Agreement), the Debtor received less than a reasonably equivalent value for the transfer. I find no merit in this argument. As I ruled above, the January Agreement is not enforceable against the Debtor. Rather, her rights are governed by her earlier agreement with the Debtor, under which the policy is part of package of compensation she received in exchange for ten years of continuous service in the Debtor's employ. The Trustee has not shown (or even attempted to show) that the value of the service thus provided to the Debtor was less than reasonably equivalent to the value of the compensation paid her by the Debtor. The Trustee has therefore failed to establish that this transfer is avoidable as a fraudulent transfer under § 548(a)(1).

Third, and in the alternative, the Trustee contends in Count IV of the Amended Complaint that, if the Policy is deemed to have been transferred to McQuillan during the 90 days immediately preceding the filing of the involuntary petition against the Debtor, then that transfer is avoidable under 11 U.S.C. § 547(b) as a preferential transfer. This count fails because the transfer of the beneficial interest occurred as of July 1, 2003, more than 90 days before the commencement of this bankruptcy case. Except as against insiders (the Trustee does not suggest that McQuillan is an insider), transfers avoidable under § 547(b) must have occurred "on or within 90 days before the date of the filing of the petition." 11 U.S.C. § 547(b)(4)(A).

Fourth, the Trustee argues that if McQuillan acquired an equitable interest in the Policy

prepetition, that interest, being unrecorded, would still be inferior to the Trustee's rights as a

hypothetical lien creditor under 11 U.S.C. § 544. The Trustee makes this argument in his post-

trial brief but did not assert his powers under § 544 in his complaint or in any pleading. Also, in

his post-trial argument, he cites § 544 in general but no specific subsection or language therein.

Nor does the Trustee clarify how he purports to be using these powers: whether as the basis of a

count to avoid the transfer and recover the equitable interest, as an affirmative defense, or as the

basis of a count to establish priority.[20] Nor has the Trustee cited Massachusetts authority for the

proposition that such lien rights as he enjoys under § 544 would have priority over the rights of

the holder of an unrecorded equitable interest in the nature of a resulting or constructive trust.[21] I

therefore conclude that the Trustee has failed to assert his rights and arguments under § 544 in a

manner comporting with due process. Accordingly, without reaching the merits of this argument,

I reject the Trustee's appeal to § 544 with prejudice.

---

[20] The differences are important not only because these various appropriations of § 544 rights must be plead timely and properly, but in order to understand their interaction with § 541(d).

[21] It is not at all clear that the Trustee would prevail on the merits. In *CRS Steam, Inc. v. Engineering Resources, Inc. (In re CRS Steam, Inc.)*, 225 B.R. 833, at 838 (Bankr.D.Mass. 1998), Judge Queenan summarized the state of the law:

> Under general state law, the beneficiary of a constructive trust has priority over creditors of the constructive trustee holding judicial liens. If the estate representative asserts only judicial lien rights, as he must under section 544(a) if personal property is involved, the estate fares no better than do judicial lien creditors outside of bankruptcy. But state law is kinder to a bona fide purchaser for value. That party enjoys priority over the beneficiary of a constructive trust.

The present case involves personal property. Under § 544(a), a trustee can exercise the rights of a bona find purchaser for value only as to real estate.

## Conclusion

Accordingly, I hold that, at least since July 1, 2003, the equitable interest in the Policy was not property of the Debtor and is not property of the bankruptcy estate. The Proceeds, as the residue of the Policy, are property of McQuillan. She is entitled to the prompt delivery of the Proceeds to her together with interest accrued through the date of such delivery. Judgment will enter accordingly.

Date: February 6, 2006

Robert Somma
United States Bankruptcy Judge

cc: Adam J. Ruttenberg, Esq., for Trustee
     Stephen G. Michaels, Esq., for Leslie McQuillan

25